# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Lyniece Nelson, on behalf of
herself individually and as
personal representative of the
Estate of Henry Hilliard a/k/a
Shelly Hilliard,

Case No. 13-cv-10632
Hon. Judith E. Levy
Mag. Judge Michael J. Hluchaniuk

            Plaintiffs,

v.

City of Madison Heights, the
Madison Heights Police
Department, County of Oakland,
acting by and through its agencies
the Oakland County Sheriff's
Department and Oakland NET,
Madison Heights, Oakland County
Police Officer Chad Wolowiec, and
Madison Heights Police Officer
David Koehler,

            Defendants.

_____/

# OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [111]

This case arises out of the murder of Shelly Hilliard (a

transgender woman, née Henry Hilliard).  The decedent's mother

Lyniece Nelson brought substantive due process, wrongful death, and interference with familiar relations claims on her own behalf and as personal representative of Hilliard's estate, against the City of Madison Heights, Oakland County, Oakland County Police Officer Chad Wolowiec, and Madison Heights Police Officer David Koehler.

Much ink has been spilled over the events that led to Hilliard's death, but the salient facts are few: After defendant Wolowiec and other officers found Hilliard with marijuana, she voluntarily agreed to call and order drugs from her dealer Qasin Raqib so that she would not be arrested. While Raqib and his companion Marquita Clark were driving to deliver the drugs, officers made a routine traffic stop. Within an hour of agreeing to use "all reasonable means to protect [Hilliard's] identity," and with full appreciation of the danger it would cause to Hilliard, defendant Wolowiec told Clark that Hilliard had set them up. Wolowiec testified that he gave up Hilliard's identity for no reason. Three days later, Raqib and his accomplice James Matthews abducted, tortured, and then murdered Hilliard because she had informed on them. Her body was found burned and dismembered hours after her abduction.

2

This Court must decide whether the remaining defendants—Oakland County and officer Chad Wolowiec—can be held responsible for Hilliard's death. They can. For the reasons set forth below, defendants' motion for summary judgment is denied.

## I.   Background

This case centers generally on the events that led to the death of Shelly Hilliard. According to Qasin Raqib (also known as "Red") and James Matthews, the two who murdered Hilliard, and also Marquita Clark, Raqib's companion the night that Clark and Raqib were arrested by defendants, defendant officer Chad Wolowiec told Clark that Hilliard had set up Raqib, which motivated Raqib to kill her. (Dkt. 114-2 at 1; Dkt. 114-3 at 2; Dkt. 114-4 at 1; Dkt. 114-5 at 2.)[1]

---

[1] "As a general rule, 'evidence submitted in opposition to a motion for summary judgment must be admissible. Hearsay evidence . . . must be disregarded.'" *Beckett v. Ford*, 384 F. App'x 435, 442 (6th Cir. 2010) (quoting *Alpert v. United States,* 481 F.3d 404, 409 (6th Cir. 2007)). The cited evidence may be considered in deciding the motion, because each level of hearsay—the reports, the witness' assertions, and defendant Wolowiec's assertion—is an exception, is excluded, or is not being used for its truth. The witness-statement reports may be considered as records of a regularly conducted activity. *See* Fed. R. Evid. 803(6); *Miller v. Field*, 35 F.3d 1088, 1091 (6th Cir. 1994). And the assertions by Marquita Clark, Qasin Raqib, and James Matthews may be considered as statements against interest. *See* Fed. R. Evid. 804(b)(3)(A). Finally, plaintiff does not seek to introduce defendant Wolowiec's assertion for its truth (*i.e.*, to prove that Hilliard informed on her murderers). Rather, plaintiff seeks to introduce the evidence to establish that the

On October 19, 2011, Hilliard was at a Motel 6 in Madison Heights, Michigan, with her friend Alonzo Hood (also known by the names Brittney and Kita). (*See* Dkt. 114-7 at 2-3; Dkt. 114-8 at 4.) Defendant Wolowiec testified that he was conducting a narcotic investigation at the motel and saw a bag of marijuana through an open window when he was walking past Hilliard's room. (*See* Dkt. 111-2 at 12.)[2] Defendant Wolowiec called police officer David Koehler to the scene, and the officers knocked on the door shortly after midnight. (*Id.*) They found used marijuana cigarettes in an ashtray and a bag of marijuana in the bathroom. (*Id.*)

Hood gave the officers a false name and was arrested for possession and obstruction of justice. (Dkt. 111-2 at 13; Dkt. 114-8 at 4-5.) To avoid arrest, Hilliard agreed to become a confidential informant and to call Raqib to request drugs.[3] (Dkt. 111-3; Dkt. 114-13.) Hilliard

---

statement directly and proximately caused private actors to murder Hilliard. In any case, defendant Wolowiec's statement would be excluded from hearsay because he is an opposing party. *See* Fed. R. Evid. 801(d)(2)(A).

[2] Officer David Koehler's contemporaneous report indicates that the investigation was initiated because defendant Wolowiec smelled marijuana emanating from the room. (*See* Dkt. 114-8 at 4.)

[3] Defendant Wolowiec claims that Hilliard sought to become a confidential informant despite the risks he described to her because she wished to "work off" the possession charge. (Dkt. 111-2 at 13.) Plaintiff claims that defendant Wolowiec accused Hilliard of being a drug dealer and told her that she could either go to jail

called Raqib on speaker phone and ordered an "eight ball" of cocaine and a quarter-ounce of marijuana. (Dkt. 114-13 at 6.) According to defendant Wolowiec's report, Raqib asked if Hilliard had $335, Hilliard asked Wolowiec if "this was ok," and Wolowiec responded directly to Raqib that he had the money. (*Id.*) Raqib then stated that he would be there in approximately twenty minutes. (*Id.*) Hilliard signed a form provided by defendant Wolowiec, titled Oakland County Narcotics Enforcement Team Confidential Source, which provided in relevant part that "[t]he Oakland County Sheriff Department will use all reasonable means to protect your identity; however, this cannot be guaranteed." (Dkt. 114-12 at 1.)[4]

At approximately 1:12 AM, officer Koehler observed a vehicle that matched the description provided by Hilliard and made a traffic stop. (Dkt. 114-13.) Defendant Wolowiec was parked across the street with Hilliard in his vehicle, and he testified that he drove away from the scene so that Hilliard would not be seen by Raqib. (Dkt. 111-2 at 15.)

---

or call her supplier. (*See* Dkt 114 at 11-12; Dkt. 114-10 at 1-2; Dkt. 114-11 at 1.) Plaintiff's evidence is likely inadmissible hearsay and will not be considered for the purposes of this motion. *See Beckett*, 384 F. App'x at 442.

[4] There were also handwritten notes on the second page of the form: "10-20-11 Conducted 1 deal with CI (Reliable). 10-21-11 Deactivated – worked off charges. 11-11-11 Found out Hilliard was deceased." (Dkt. 114-12 at 2.)

Officer Koehler conducted a canine search of Raqib's car while Raqib and a passenger, Marquita Clark, waited in a third officer's vehicle. (Dkt. 111-5 at 13; Dkt 114-14.)  While the canine search was ongoing, Royal Oak Officer Sydowski was called to the scene to conduct a search of Clark.  Officer Sydowski searched Clark around 1:50 AM and found a bag of marijuana in Clark's sock.  (Dkt. 111-5 at 14-15.)

After officer Sydowski's search, defendant Wolowiec joined officers Sydowski and Koehler and then spoke directly with Clark.  (*Id.* at 15.) He testified that he told Clark he was the person who had ordered the drugs over the phone and that he asked Clark where she got the drugs. He also testified that he did not think that saying so would reveal Hilliard as the informant.  (Dkt. 111-2 at 16.)  According to defendant Wolowiec, Clark was not on the initial call and he did not think about whether she would relay the information to Raqib.  (*Id.*)

Plaintiff contends that defendant Wolowiec explicitly told Clark that Hilliard set Raqib up for arrest.  Clark essentially testified to this fact again at an in-court preliminary examination related to Hilliard's murder.  (*See* Dkt. 114-6 at 4-5.)  Clark also testified that she told Raqib that Hilliard was an informant when they were released from jail the

day after their arrest. (*Id.* at 6.) In interviews with police on November 11, 2011, and March 5, 2012, Raqib stated that Clark told him that Hilliard informed on him. (*See* Dkt. 114-3; Dkt. 114-4.) In any case, defendants' counsel conceded during oral argument that, for the purposes of this motion, the Court can presume that defendant Wolowiec disclosed Hilliard's identity directly to Clark.

At approximately 1:00 AM on October 23, 2011, Robert Bowen, a friend of Hilliard's and a taxi driver, drove Hilliard to a location in Detroit. Shortly thereafter, she was abducted by Raqib and Matthews. (Dkt. 111-7 at 4.) At approximately 4:30 AM, Hilliard's body was found burned and dismembered on the I-94 service drive near Bewick Street.

Defendant Wolowiec learned that Hilliard was missing at some point over the course of the next couple of weeks. (Dkt. 111-2 at 31-33.) He made no official report but called the missing-persons unit in Detroit to provide them with information on Hilliard. (*Id.*) When defendant Wolowiec later learned that Hilliard was dead, he again made no official report but contacted Detroit homicide to relay the information that he had provided to the Detroit missing-persons unit. (*Id.* at 33-34.)

Captain Joseph Quisenberry of the Oakland County Narcotics Enforcement Team ("NET"), the task force for which defendant Wolowiec worked during the relevant period, testified that although general guidelines regarding policies and procedures of the department exist, Oakland County NET officers were not required to read them. (Dkt. 115-4 at 3.)  Captain Quisenberry also testified that there were not any official, written policies or unofficial, unwritten practices or customs regarding the use of informants.  (*Id.* at 4.)

But the record indicates that the Oakland County NET maintained Confidential Informant Guidelines that set forth the policies and procedures regarding confidential informants.  (Dkt. 115-3.) The guidelines describe an informant as a person "whose identity must be kept in confidence" and notes that officers should tell informants that they "will use all lawful means to protect their identity."  (*Id.*) Defendant Wolowiec testified that he never received, reviewed, or was even made aware of Oakland County's policy regarding confidential informants.  (Dkt. 111-2 at 8-9, 36-37.)

Finally, Captain Quisenberry testified that there were no "measures that an officer should take themselves to help protect [a] CI's

8

identity" and that no policy would have explicitly prohibited Wolowiec from disclosing Hilliard's identity to Raqib and Clark. (Dkt. 115-4 at 4-5.) He testified that violations of department policy would be dealt with differently depending "on the circumstances and the severity of the complaint." (*Id.* at 7.) But following the incidences giving rise to plaintiff's complaint, there was no investigation, discussion, analysis, or evaluation of defendant Wolowiec's actions. (*Id.* at 2.)

## II.   Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir. 2002)).

The Court applies the same summary judgment standard to a motion based on qualified immunity; the facts must therefore be viewed in the light most favorable to plaintiff and genuine disputes of fact cannot be resolved in favor of defendants. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

## III.   Analysis

On March 19, 2015, plaintiff stipulated to the dismissal of her claims against defendants Madison Heights and officer David Koehler. (Dkt. 110.)   On March 30, 2015, the remaining defendants—Oakland County and officer Chad Wolowiec—filed a motion for summary judgment.   (Dkt. 111.)   Defendants argue that they are entitled to summary judgment because the substantive due process claim fails as a matter of law, defendants are entitled to qualified immunity, the municipality cannot be held liable, and the interference with familial relations claim fails as a matter of law.

### a. Whether defendant Wolowiec's disclosure of Hilliard's identity is cognizable under the state-created-danger doctrine.

Plaintiff argues that defendants violated Hilliard's right not to be deprived of life without due process, as secured by the Fourteenth Amendment.  "[I]t goes without saying that an individual's 'interest in preserving her life is one of constitutional dimension.'"  *Kallstrom v. City of Columbus*, 316 F.3d 1055, 1063 (6th Cir. 1998) (quoting *Nishiyama v. Dickson Cty.*, 814 F.2d 277, 280 (6th Cir. 1987) (*en banc*)). Thus the first element of plaintiff's § 1983 action—deprivation of a right secured by the Constitution or laws of the United States—is not at issue.  Instead, the parties dispute whether the deprivation of life, which was caused by private actors, can be attributed to the state as "under color of state law" for purposes of § 1983.  For plaintiff to overcome defendants' motion for summary judgment, she must establish that defendants are liable under the state-created-danger theory of constitutional liability.

To establish due process liability under the state-created-danger doctrine, plaintiff must show three things: an affirmative act by state actors that created or increased the risk, a special danger to the victim

11

as distinguished from the public at large, and the requisite degree of culpability (here, deliberate indifference).  *See Kallstrom*, 136 F.3d at 1066-67.  Defendants do not argue that the second element, a "special danger," is not established.  Therefore only the first and third elements, whether there was an "affirmative act" by the state and whether the state acted with "deliberate indifference," will be addressed.

Defendants argue that the first element cannot be established because Hilliard voluntarily agreed to become a confidential informant, and she thus cannot "satisfy the requirement that state action 'substantially increase[d] the likelihood that a private actor would deprive [her] of [her] liberty interest in personal security,' as required by *Kallstrom*."  (Dkt. 111 at 18 (quoting *Summar v. Bennett*, 157 F.3d 1054, 1059 n.2 (6th Cir. 1998).)  But defendants' reliance on *Summar* is misplaced.  There, the court noted that the case was different from others in which courts had found the affirmative act element satisfied, in part "because Summar voluntarily elected to serve as a confidential informant, despite being advised that he would have to testify and reveal his status as an agent of the police."  *See Summar*, 157 F.3d at 1058.  Thus the disclosure at issue in that case—revealing the

12

informant's identity to the district attorney for the purpose of preparing an indictment—was explicitly contemplated by the decedent when he volunteered to become a confidential informant.

That did not happen here. To the contrary, the agreement between Hilliard and defendant Wolowiec was that the officers would use "all reasonable means to protect [her] identity." Beyond the warning that confidentiality could not be guaranteed, no officer advised Hilliard that she would eventually "have to testify and reveal h[er] status as an agent of the police." *See id.* at 1058. And defendant Wolowiec did not testify that such a role was ever contemplated for Hilliard. Rather, Hilliard was "[d]eactivated" without any further participation because she had "worked off charges." (*See* Dkt. 114-12 at 2.) Defendant Wolowiec's actions were thus beyond the scope of Hilliard's voluntary participation.

And the officer in *Summar* disclosed the confidential informant's identity "to the district attorney's office to assist its preparation of charges against" the informant's drug dealer. *Summar*, 157 F.3d at 1056 (dealer learned of informant's identity because the "charges specifically observed that one 'James A. Summer [sic]' had purchased

drugs from" dealer).  Defendant Wolowiec revealed Hilliard's identity directly to the individuals she informed on, which is very different from revealing an informant's identity to the district attorney for the purpose of preparing an indictment.  It was not necessary to reach the issue in *Summar*, but the state had a legitimate interest that was served by giving the informant's identity to the district attorney's office.  Here, defendant Wolowiec testified that he had no reason for giving up Hilliard's name, and the county has not since identified one.  This case is more like *Kallstrom v. City of Columbus*, where the Sixth Circuit found that the affirmative-act element had been met when the state actor "releas[ed] private information from undercover officers' personnel files to defense counsel representing violent gang members whom the officers had investigated."  *Kallstrom*, 136 F.3d at 1063.

Hilliard voluntarily agreed to become a confidential informant with the explicit promise from the police that they would use "all reasonable means to protect [her] identity."  Defendant Wolowiec took no measures to protect Hilliard's identity; rather, he revealed her identity directly to those she informed on, without undertaking any effort to ascertain the danger that this might cause to Hilliard.  Plaintiff

14

has established a material issue of fact as to whether defendant Wolowiec, by revealing Hilliard's identity directly to the drug dealer she had set up, substantially increased the danger she faced.

Defendants argue that even if plaintiff satisfies the first element of her state-created-danger claim, it would fail under the third element because defendant "Wolowiec's decision to reveal [Hilliard's identity] was a split second decision that did not involve reflection as to which course of action to follow," and plaintiff has not "establish[ed] that [d]efendant Wolowiec acted with intent to harm." (*See* Dkt. 111 at 19.) However, the fact that defendant Wolowiec decided to reveal Hilliard's identity with no articulated governmental purpose and without a second's thought does not mean "*opportunities* for reasoned deliberation [were] not present." *See Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003) (emphasis added).

Defendant Wolowiec had more than thirty minutes between the time of the traffic stop and the time he chose to speak with Clark. No life was in jeopardy during this period, and defendants have not presented any evidence that immediate action was necessary. The "deliberate-indifference standard is appropriate," because defendant

15

Wolowiec had the "*opportunity* for reflection and unhurried judgments," see *id.* (emphasis added), and "actual deliberation was practical." *See Ewolski v. City of Brunswick*, 287 F.3d 492, 511 (6th Cir. 2002) (using deliberate indifference standard to analyze constitutionality of officer's tactical decisions in a hostage situation).

Deliberate indifference is characterized by "subjective recklessness," which "requires the § 1983 plaintiff to show that the state official 'knows of and disregards an excessive risk to the victim's health or safety.'" *Id.* at 513 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *see also McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 469 (6th Cir. 2006). Put differently, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 493 (6th Cir. 2002) (quoting *Farmer,* 511 U.S. at 837). And "even where the governmental actor is subjectively aware of a substantial risk of serious harm," the court "will be unlikely to find deliberate indifference if his action was motivated by a countervailing, legitimate governmental purpose." *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 542 (6th Cir. 2008).

16

Defendants argue that under the deliberate-indifference standard, defendant "Wolowiec's discussion with the decedent about the potential risks demonstrates he was not indifferent to them." (Dkt. 111 at 21.) But the relevant inquiry here is whether defendant Wolowiec acted with deliberate indifference at the time he revealed Hilliard's identity to Clark. Defendants' argument concedes that, at a minimum, defendant Wolowiec was subjectively aware of the risks that Hilliard faced. For example, defendant Wolowiec testified that he "took Shelly away from the room because [he] didn't want Shelly to be at the room in case [Red] did show up." (*See* Dkt. 111-2 at 13.) He also testified that he later called Hilliard to "tell her that they believed—Clark and Red believed that she had set them up and appeared to possibly be upset about it." (*Id*. at 23.)[5] He allegedly "advised her, if there was a problem, one, to lay low and stay away from [Red] and not talk to him, but two, if there was a problem or anything that seemed out of the

---

[5] Specifically, defendant Wolowiec testified that Raqib and Clark learned that Hilliard was the informant because "during the booking process . . . Alonzo Hood . . . started yelling to both subjects, Raqib, AKA Red, and Clark that Shelly [Hilliard] was the one who set him up." (Dkt. 111-2 at 23.) Plaintiff argues that it would have been impossible for defendant Wolowiec to have called Hilliard for this purpose, because Raqib and Clark were not yet at the station, and thus could not yet have learned of Hilliard's identity from Hood at the time of the phone call as defendant Wolowiec testified. (*See* Dkt. 114 at 17.)

ordinary or if they were coming by her, to call the local police department via 911 and go from there." (*Id.*)

Viewing the evidence in the light most favorable to plaintiff, defendant Wolowiec, at the time he revealed Hilliard's identity to Clark, acted with deliberate indifference to what he knew to be a risk of substantial harm. The evidence shows that he was subjectively aware of a substantial risk. And the evidence shows that he disregarded that risk. For example, defendant Wolowiec testified that Hilliard "didn't know much about Red other than the fact that Red was her go-to guy for buying drugs and that she's a prostitute, and she uses this guy frequently to purchase narcotics from for her clients and herself." (*Id.* at 13.) Yet defendant Wolowiec made no attempt, other than to ask Hilliard for her opinion, to determine how dangerous Raqib and his companion might be:

> "Are you afraid if this guy is going to hurt you at all if he finds out or anything like that?" She said, "No." I went over this numerous times. "Are you sure? Is there any chance you'll get hurt? Because I don't want to do it if there's any chance you're going to get hurt." "No, no, no, I'm not going to get hurt," is what she tells me. "Everything is fine. It's not a problem."

(*Id.*)  With only this knowledge, he then revealed Hilliard's identity to Clark.  To be clear, defendant Wolowiec understood that Hilliard "didn't know much about Red," but did absolutely no independent investigation to determine whether Raqib was dangerous.  Based on his testimony, a jury could find that defendant Wolowiec was subjectively aware of a substantial risk and disregarded it.

The situation in this case is not like that in *Ewolski*, as defendants argue.  There, the court found that an officer was not deliberately indifferent for employing a tactic that resulted in a murder and suicide during a hostage situation.  *See* 287 F.3d at 495.  The officer was faced with different options that all posed unique risks, and the officer ultimately had to choose among those options.  The Sixth Circuit found that the officer did not "knowingly and unreasonably opt[] for a course of conduct that entailed a substantially greater risk than the available alternatives."  *Id.* at 515.  Here, defendant Wolowiec was faced with the options of revealing Hilliard's identity or not.  Defendants failed to identify and the Court cannot otherwise discern

any governmental interest that was served by doing so.[6]   Unlike in *Ewolski*, defendant Wolowiec "knowingly and unreasonably" chose to reveal Hilliard's identity to her eventual murderer, which was a "substantially greater risk than the available alternative[]"—keeping Hilliard's identity confidential.  *See id.*  Defendants are not entitled to summary judgment on this claim.

### b. Whether defendant Wolowiec violated clearly established law.

Qualified immunity is an affirmative defense available to government officials performing discretionary functions.  *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).  But "qualified immunity is unavailable" as a defense "in § 1983 claims against a municipality." *Moldowan v. City of Warren*, 578 F.3d 351, 392 (6th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 242-43 (2009)).   Whether a

---

[6] Defendants state that "[d]efendant Wolowiec's decision to reveal [Hilliard's identity was] in an effort to get Clark to reveal additional information."  (Dkt. 111 at 19.)  This is contradicted by defendant Wolowiec's testimony.  When asked "Why did you tell [Clark] that you had ordered drugs from Red," defendant Wolowiec responded "I don't know."  (Dkt. 111-2 at 16.)  When asked the follow-up question "Did you think that by telling her that you had ordered drugs from Red, that that would cause her to give you more information than she would have otherwise," he responded "Potentially."  (*Id.*)  Defendants make the conclusory statement that revealing Hilliard's identity "also supported the governmental interest of investigating drug crimes."  (Dkt. 111 at 19.)  Without more, defendants fail to establish how revealing Hilliard's identity furthers this interest.

defendant is entitled to qualified immunity "generally turns on the objective legal reasonableness of the action . . . assessed in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Plaintiff bears the burden of proving that a defendant is not entitled to qualified immunity. *Gardenshire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000).

The Court undertakes a two-step analysis to determine whether a defendant is entitled to qualified immunity. First, "viewing the facts in the light most favorable to plaintiff, [the Court] determine[s] whether the allegations give rise to a constitutional violation." *See Shreve v. Franklin Cty.*, 743 F.3d 126, 134 (6th Cir. 2014). Second, the Court "assess[es] whether the right was clearly established at the time of the incident." *See id.* The Court may undertake either step first. *Pearson*, 555 U.S. at 236. The first step has been addressed, and there is sufficient evidence to establish that defendant Wolowiec violated Hilliard's constitutional rights under the state-created-danger doctrine.

Under the second step, a right is "clearly established" if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," which is an objective inquiry. *Saucier v. Katz*,

21

533 U.S. 194, 202 (2001). Lower courts must not define the right at "a high level of generality." *Ashcroft v. Kidd*, 131 S. Ct. 2074, 2084 (2011). Instead, courts must define the right "on the basis of the 'specific context of the case.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Saucier*, 533 U.S. at 201). But "there need not be a case with the exact same fact pattern, or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional." *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

The Court may consider decisions by the United States Supreme Court, the Sixth Circuit, and district courts within the Sixth Circuit to determine whether the law has been clearly established. *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002). Decisions from other circuits may be considered "if they 'point unmistakably to the unconstitutionality of the conduct complained of and [are] so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.'" *Barrett v. Stubenville*

22

*City Sch.*, 388 F.3d 967, 972 (6th Cir. 2004) (quoting *Ohio Civil Serv. Emps. Ass'n v. Seiter,* 858 F.2d 1171, 1177 (6th Cir. 1988)) (alterations in original); *see also id.* at 972. ("A few admittedly novel opinions from other circuit or district courts are not enough to form the basis for a clearly established constitutional right in the Sixth Circuit.").

In *Kallstrom*, which established the state-created-danger theory of constitutional liability in the Sixth Circuit, the court found that the municipality "create[d] a constitutionally cognizable special danger giving rise to liability under § 1983" when it released police officers' addresses, phone numbers, and driver's licenses and the officers' families' names, addresses, and phone numbers to defense counsel in a criminal case. *Kallstrom v. City of Columbus*, 316 F.3d 1055, 1063 (6th Cir. 1998). The court held that plaintiffs have a fundamental interest in limiting the release of personal information that increased their "vulnerability to private acts of vengeance." *Id.* The court reasoned that "[i]ndividuals have 'a clearly established right under the substantive component of the Due Process Clause to personal security and to bodily integrity.'" *Id.* at 1062-63 (quoting *Doe v. Claiborne Cty.,* 103 F.3d 443, 506-07 (6th Cir. 1996) (internal citations omitted). It

"goes without saying that an individual's 'interest in preserving her life is one of a constitutional dimension.'" *Id.* at 1063 (quoting *Nishiyama v. Dickson Cty.*, 814 F.2d 277, 280 (6th Cir. 1987) (*en banc*)).

It was thus clearly established at the time defendant Wolowiec revealed Hilliard's identity directly to the individuals she set up for arrest that she had a right to nondisclosure of "particularly sensitive" information, where the "persons to whom it was disclosed were *particularly dangerous vis-à-vis plaintiff*[]." *See Barber v. Overton*, 496 F.3d 449, 456 (6th Cir. 2007) (emphasis in original).[7] *Cf. Summar v. Bennett*, 157 F.3d 1054, 1059 (6th Cir. 1998) (no substantial risk of harm where person to whom informant's identity was disclosed was the district attorney). The instant case is factually stronger than *Kallstrom*, where the disclosure of the information *itself* gave rise to a cognizable constitutional claim. No plaintiff in *Kallstrom* was physically injured; the court found that the privacy violation was enough. Here, Hilliard was abducted, tortured, and murdered by those to whom her identity was directly revealed. *See Barber*, 496 F.3d at 459

---

[7] Plaintiff's expert testified that defendant Wolowiec's actions were "an egregious violation of long accepted law enforcement practice and professional standards" and "exposed Hilliard to extreme danger." (*See* Dkt. 115-2.)

(clarifying that generally in cases analyzing state-created-danger claims, a "private actor actually *violated* the plaintiff['s] constitutional rights" and thus "identifying the deprivation [i]s a straightforward exercise," whereas "*Kallstrom*, on the other hand, invoked the state-created-danger formulation in the *absence* of any harm from a private actor") (Cook, J., concurring) (emphasis in original).

From the perspective of an objectively reasonable officer, defendant Wolowiec had fair notice that it would violate Hilliard's constitutional rights to disclose her identity directly to individuals who "were particularly dangerous" to her, *id.* at 456, especially given that defendant Wolowiec was subjectively aware of the substantial risk, had no reason or governmental interest to justify taking that risk, and had agreed to use "all reasonable means to protect [her] identity." Defendant Wolowiec is not entitled to summary judgment on the basis of qualified immunity.

### c. Whether the municipality may be liable for defendant Wolowiec's actions.

Plaintiff argues that defendant Oakland County may be liable because its policies and procedures would "approve, authorize, and

sanction" defendant Wolowiec's action, and alternatively because defendant Oakland County was deliberately indifferent in its failure to train its officers.

Plaintiff's argument that defendant Wolowiec's actions were sanctioned by defendant Oakland County is not consistent with the record. "Local governing bodies . . . can be sued directly under § 1983 . . . where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). But Oakland County's Confidential Informant Guidelines make clear that a criminal informant's "identity must be kept in confidence." (*See* Dkt. 115-3.) The policy also indicates that "the department will use all lawful means to protect [the informant's] identity." (*Id.*) Thus the way in which defendant Wolowiec disclosed Hilliard's identity to Clark falls outside the scope of these guidelines.

And plaintiff's argument that the municipality ratified defendant Wolowiec's conduct by failing to investigate his conduct after-the-fact is

not supported by sufficient evidence.  To establish that defendant Oakland County ratified defendant Wolowiec's conduct by failing to investigate after-the-fact, plaintiff must demonstrate that the municipality's misconduct was "either intentional or at the least, grossly negligent."  *See Tompkins v. Frost*, 655 F. Supp. 468, 472 (6th Cir. 1987).  The court in *Tompkins* made note of the following factors in finding that the failure to investigate did not trigger municipal liability:

> First, the only notice to the county of the misconduct were the remarks of a criminal defense attorney to an assistant prosecutor during plea negotiations.  Such a claim, made in the context of attempting to bargain away criminal charges, is not of the type that must necessarily lead to an investigation.  Plaintiff made no formal, or informal, complaint of police brutality.  Second, the assistant prosecuting attorney was not shown to be a policymaker in the area of investigating police misconduct.  No evidence in the record indicates any responsibility on his part to investigate police misconduct.  Such functions are held by the sheriff, and perhaps the prosecutor, but not by every agent of each of them.  Third, the record is devoid of evidence that the failure of the county to investigate was willful, reckless or grossly negligent.  Plaintiff's proofs barely establish a genuine issue of fact that the county received notice and entirely fail to create a question of fact beyond the notice.

*Id.* at 472-73.  Plaintiff in this case similarly failed to present evidence that any Oakland County official was aware that defendant Wolowiec

27

disclosed Hilliard's identity as a criminal informant. There is also no evidence that defendant Oakland County's failure to investigate was willful, reckless, or grossly negligent.

And even if the Court were to find that defendant Oakland County was willful, reckless, or grossly negligent, there would still be insufficient evidence to establish the requisite causal link. After an individual's rights have been violated, a subsequent failure to investigate that very same incident, on its own, cannot be the "moving force" behind the alleged constitutional deprivation. *See id.* at 472 ("Wrongful conduct after an injury cannot be the proximate cause of the same injury."); *Hullett v. Smiedendorf*, 52 F. Supp. 2d 817, 828 (W.D. Mich. 1999) ("[M]unicipal liability for failing to investigate or discipline its officers cannot be derived from a single act by a non-policy-making municipal employee . . . . Proof of the existence of the policy *prior* to the incident that is the subject of the complaint is necessary . . . ."); *Fox v. VanOosterum,* 987 F. Supp. 597, 604 (W.D. Mich. 1997) ("[P]laintiff argues . . . that the Sheriff's decision, made after the violation took place, somehow caused the violation to occur. Plaintiff's assertion defies logic."). Plaintiff has not presented evidence to establish a causal

connection between the municipality's failure to investigate and plaintiff's injury.

But municipal liability need not be based on an explicitly articulated official policy or a post-incident ratification. *See Monell*, 536 U.S. at 690-91 ("[B]y the very terms of the statute, [local governments] may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval . . . ."). A municipality's failure to train its employees may constitute an official policy when the failure "evidences a deliberate indifference to the rights of its inhabitants." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390; *see Gregory v. City of Louisville,* 444 F.3d 725, 753 (6th Cir. 2006) ("[A] systematic failure to train police officers adequately is a

custom or policy which can lead to municipal liability.") (citing *Harris,* 489 U.S. at 388).

Under a "failure to train" theory of municipal liability, plaintiff must show that a training program is inadequate to the tasks that the officers must perform, the inadequacy is the result of the municipality's deliberate indifference, and the inadequacy is closely related to or actually caused the plaintiff's injury. *Plinton v. Cty. of Summit,* 540 F.3d 459, 464 (6th Cir. 2008) (citing *Harris,* 489 U.S. at 389-91).

Where, as here, a plaintiff brings a deliberate indifference claim "based on a single violation of rights," the plaintiff must show "'a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result.'" *Okolo v. Metro. Gov't*, 892 F. Supp. 2d 931, 942-43 (M.D. Tenn. 2012) (quoting *Harvey v. Campbell Cty., Tenn.*, 453 F. App'x 557, 567 (6th Cir. 2011)). The "single-incident theory" is undoubtedly narrow, but courts deny summary judgment "when its strict requirements have been met." *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 391 (S.D.N.Y. 2013). Although claims that challenge the adequacy of training

generally fail, claims that allege a complete lack of training may survive. *See id.* at 391-92.[8]

Here, defendant Wolowiec testified that he received no training regarding confidential informants other than how to register them, (see Dkt. 111-2 at 36-37), and although confidential informant guidelines existed, defendant Wolowiec testified that he did not receive the guidelines and was not made aware that they existed.  (*See* Dkt. 111-2 at 8 ("Q  Did you receive a written set of policies or procedures form Oakland County?  A  No.  Q  Have you ever heard of Oakland County NET Operational Guidelines?  A  No."); *id.* at 8-9 ("Q  All right.  I have handed you . . . 'Oakland County Sheriff's Office Narcotics Enforcement

---

[8] Comparing *Cristini v. City of Warren*, No. 07-11141, 2012 U.S. Dist. LEXIS 162325, at *38-39 (E.D. Mich. Nov. 14, 2012) (denying summary judgment on single-incident theory where police officers allegedly received no training as to handling exculpatory evidence), *Schwartz v. Lassen Cty.*, 838 F. Supp. 2d 1045, 1057-59 (E.D. Cal. 2012) (denying motion to dismiss under single-incident theory that jail's personnel lacked any training on providing proper medical care to inmates), and *Wereb v. Maui Cty.*, 830 F. Supp. 2d 1026, 1033-37 (D. Haw. 2011) (denying summary judgment on single-incident theory where jail employees allegedly had no training on detecting when inmates need urgent medical care), with *Dillman v. Tuolumne Cty.*, No. 13-cv-404, 2013 U.S. Dist. LEXIS 103099, at *20-21 (E.D. Cal. July 23, 2013) (dismissing claim under single-incident theory where plaintiff challenged adequacy, rather than "complete lack of training" regarding proper use of handcuffs and strip searches), and *Ault v. Baker*, No. 12-cv-00228, 2013 U.S. Dist. LEXIS 43404, at *28-29 (E.D. Ark. Mar. 27, 2013) (dismissing claim under single-incident theory where plaintiff failed to plead sufficient facts showing consequences of lack of training as to excessive force and medical needs were patently obvious).

Team Operational Guideline.   Subject: Confidential Information Guidelines.' . . .   Had you seen this document while you were still working for Oakland County NET?  A  Not that I'm aware of, no."); *see also id*. at 33-38 (reviewing defendant Wolowiec's record of training, which did not include training on confidential informants).)   When asked specifically "Did [anyone] ever advise you of any circumstances under which it would be appropriate to disclose the identity of a [confidential informant]," defendant Wolowiec testified "I don't recall." (*Id*. at 36.)

Failing to provide any training whatsoever, provide written guidelines, or even advise defendant Wolowiec where he might find such guidelines may rise to the level of constitutional inadequacy. *Cf. Morrison v. Stephenson*, No. 06-cv-283, 2008 U.S. Dist. LEXIS 4589, at *28-29 (S.D. Ohio Jan. 9, 2008) (granting summary judgment because plaintiff failed to show that officer "was unfamiliar with the policy or that it was ignored by him," municipality told officer "where the entire policy manual, including all use of force policies, was kept and where it could be reviewed," and "officers received Taser training" two months before the use-of-force incident at issue).  In the light most favorable to

32

plaintiff, defendant Wolowiec's testimony and other record evidence, (see 115-4 at 1-9), is sufficient to establish a complete lack of training regarding the use of a confidential informant, let alone specific training as to when, how, and to whom it might be appropriate to disclose a confidential informant's identity.

Plaintiff's allegations go beyond challenging the *adequacy* of training. There is evidence that defendant Oakland County provided no training whatsoever. Such "a complete failure to train the police force" is sufficient to establish a cognizable claim against defendant Oakland County. *See Okolo*, 892 F. Supp. 2d at 942-43 (quotation omitted). Defendants' motion is denied as to plaintiff's failure-to-train claim.

### d. Whether defendants may be liable under a claim of interference with familial relations.

"[S]ection 1983 provides a cause of action which is personal to the injured party." *Purnell v. Akron*, 925 F.2d 941, 948 n.6 (6th Cir. 1991) (citing *Jaco v. Bloechle*, 739 F.2d 239, 241 (6th Cir. 1984) ("By its own terminology, the statute grants the cause of action 'to the party injured.'")). But a constitutional claim of deprivation of the right to familial association arising from the killing of a child by a state actor

33

may be cognizable in the Sixth Circuit, although it is unclear whether such a right would extend to the parent of an adult child.  *See Kottmyer v. Mass*, 436 F.3d 684, 690 (6th Cir. 2006) (citing cases), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007); *see also Brooks v. Knapp*, 221 F. App'x 402, 407-08 (6th Cir. 2007) ("The Sixth Circuit has briefly examined, in dicta, the right to familial association in the context of a § 1983 claim for deprivation of the parent-child relationship.  We express no views about that dicta . . . .") (citing *Kottmyer*, 436 F.3d at 689; *Purnell*, 925 F.2d at 948 n.6); *Russ v. Watts*, 414 F.3d 783, 791 (7th Cir. 2005) (overruling prior decision "insofar as it recognized a constitutional right to recover for the loss of the companionship of an adult child when that relationship is terminated as an incidental result of state action"); *Mitchell v. City of Warren*, No. 09-11480, 2012 U.S. Dist. LEXIS 16152, at *15 (E.D. Mich. Feb. 9, 2012) ("The *Kottmyer* court merely mentions that other circuits have recognized such a right in due process claims but does not adopt the same approach."); *Kolley v. Adult Protective Servs.*, 786 F. Supp. 2d 1277, 1292 n.14 (E.D. Mich. 2011) ("The fact that [decedent] was an

adult at the time of the relevant events may also impact Plaintiffs' entitlement to relief on the family association claim.").

The briefing on this subject was not helpful in determining whether plaintiff may bring a cause of action under § 1983 for deprivation of familial association with her adult daughter. And summary judgment cannot be granted based on defendants factual argument that "[p]laintiff cannot now seek relief in this Court for the alleged deprivation of the care, custody, and management of her daughter when her daughter was [nineteen] at the time of her death and had not been subject to [p]laintiff's custody or control for years prior to the events at issue in this case." (*See* Dkt. 111 at 24.) There is a factual dispute as to whether "such relationship existed in the time prior to [d]efendants['] alleged actions." (*See id.*) Without more, defendants' motion for summary judgment as to this claim is denied.

## IV.   Conclusion

For the reasons set forth above, defendants' motion for summary judgment, (Dkt. 111), is denied.

IT IS SO ORDERED.

Dated: October 30, 2015        s/Judith E. Levy
Ann Arbor, Michigan          JUDITH E. LEVY
                              United States District Judge

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 30, 2015.


                              s/Felicia M. Moses
                              FELICIA M. MOSES
                              Case Manager